**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| DOUGLAS S. ZEIGLER, | ) CASE NO. 5:23-CV-00068-DAR |
| | ) |
| Plaintiff, | ) JUDGE DAVID A. RUIZ |
| | ) UNITED STATES DISTRICT JUDGE |
| v. | ) |
| | ) MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY, | ) CARMEN E. HENDERSON |
| | ) |
| Defendant, | ) **REPORT & RECOMMENDATION** |
| | ) |

**I. Introduction**

Plaintiff, Douglas S. Zeigler ("Zeigler" or "Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits ("DIB"). This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). For the reasons set forth below, it is RECOMMENDED that the Court OVERRULE Claimant's Statement of Errors and AFFIRM the Commissioner's decision.

**II. Procedural History**

On February 13, 2020, Claimant filed an application for a period of disability and DIB, alleging a disability onset date of January 21, 2020. The application was denied initially and upon reconsideration, and Claimant requested a hearing before an administrative law judge ("ALJ"). On October 25, 2021, an ALJ held a hearing, during which Claimant, represented by counsel, and an impartial vocational expert testified. (ECF No. 8, PageID #: 63, Tr. at 34). On January 28, 2022, the ALJ issued a written decision finding Claimant was not disabled. (*Id*.,

1

PageID #: 43, Tr. at 14). The ALJ's decision became final on November 14, 2022, when the Appeals Council declined further review. (ECF No. 8, PageID #: 30, Tr. at 1).

On January 13, 2023, Claimant filed his Complaint to challenge the Commissioner's final decision. (ECF No. 1.) The parties have completed briefing in this case. (ECF Nos. 9 and 12). Claimant asserts the following assignments of error:

> 1. The ALJ committed harmful error when he failed to properly apply the criteria of Social Security Ruling 16-3p and failed to find that the intensity, persistence and limiting effects of Plaintiff's symptoms precluded him from engaging in substantial gainful activity on a full-time and sustained basis.
>
> 2. The ALJ erred at Steps Four and Five of the Sequential Evaluation when, contrary to Ruling 83-10, he found that despite Plaintiff's knee problems, he could perform work at the light level of exertion.

(ECF No. 9 at 1).

**III. Background**

   A. **Relevant Symptom Testimony**

The ALJ included the following summary of Claimant's reported symptom testimony:

> The claimant reports workplace limitations, including deficits of his ability to lift, squat, bend, stand, walk, climb, and see (3E/6), which he ascribes to right knee pain (10F/2), seizures, homonymous hemianopia, and a torn meniscus (2A/1), (4A/1). He has also described depression (4A/1), causing deficits of his ability to employ his memory, understand and follow instructions, to concentrate and complete tasks, to get along with others and to react appropriately to stressors and changes (3E/6, 7).

(ECF No. 8, PageID #: 51-52, Tr. at 22-23). Additionally, the ALJ summarized Claimant's testimony regarding his daily activities:

> At one point or another in the record (either in forms completed in connection with the application and appeal, in medical reports or records, or in the claimant's testimony), the claimant has reported the following daily activities: the claimant is able to attend to his

> self-care. He is able to engage in typical household chores, such as cleaning, washing dishes, laundering clothing, preparing simple meals, cutting the grass and making small household repairs. He socializes with his peer group a few times per week, helps his elderly parents, is able to shop in stores, watch television for pleasure. He is able to manage his own medications, appointments, and an e-mail account, and although his wife performs the task, considers himself able to manage his finances (1E/1), (3E), (7F/2). In short, the claimant has described daily activities, which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations.

(*Id.*, PageID #: 54, Tr. at 25).

### B. Relevant Medical Evidence

The ALJ also summarized Claimant's health records and symptoms:

> In terms of the claimant's alleged obesity, he recorded a body weight of 310 pounds on June 8, 2020 (3F/3), which corresponds to a body mass index in excess of thirty-nine. In turn, this is consistent with a body weight of 302 pounds, recorded on February 1, 2021 (10F/6), and a body weight of 307 pounds, recorded on October 13, 2021 (14F/3). [ . . . ]
>
> The claimant, already with a remote [2005] history of reconstruction of his right anterior cruciate ligament, sought treatment for a new onset right knee pain, of one weeks' duration, on November 24, 2020 (10F/2). Diagnostic imaging of the knee, dated February 9, 2021, described moderate arthritic changes, and tearing in the meniscus (10F/9), for which the claimant underwent arthroscopic surgery on February 26, 2021, without complication (10F/13). [ . . . ]
>
> The claimant was released to home exercise only, from skilled physical therapy after two sessions, describing significant improvement (10F/19) and being assessed with minimal functional limitation (10F/20).
>
> He did not use pain medications following surgery, and described that the surgery left him feeling the best he had in months (10F/17).
>
> By April 13, 2021, he was released from the care of his orthopedist to return to all activities without restriction, with an invitation to return as needed (10F/23). There is no indication of such a return.

Clinical examination, dated April 13, 2021, described incisions as healed, without evidence for infection effusion, or blood clotting, with excellent range of motion and motion and sensory function intact distally (10F/22). The claimant was given leave to put off his crutches and knee "sleeve" on March 3, 2021 (10F/14), as he exhibited no further need.

In terms of the claimant's alleged cavernous malformation, this had been assessed as the cause of his seizures, and in an attempt to halt the seizures, he underwent elective craniotomy and resection, on January 21, 2020 (1F/10, 1). There were no complications during the surgery (1F/8), but although the result has apparently worked, or at least contributed significantly to, the end of the seizures (5F/2), (14F/2), since the surgery, the claimant has had left sided, inferior, more than superior, loss of visual field, noted immediately following his surgery (1F/14-15). [ . . . ]

Diagnostic imaging of the brain, dated January 21, 2020, reported expected post-operative changes, but was otherwise unremarkable (10F/3). "Updated" imaging, dated July 7, 2021, reported diminution of post-operative signal intensities, and otherwise stable findings (13F/18).

The claimant remains on "Vimpat", an anti-seizure medication (14F/3), used with reports of multiple side effects (3E/8). However, the record shows no convincing seizures since the resection (5F/2), (14F/2).

The claimant did follow-up with a referral to optometry, but Fresnel "prism" lenses were ineffective to correct or improve his visual field deficit (6F/3). He has yet to follow-up on a referral to occupational therapy (4F/16).

His visual field deficit has remained stable over time (4F/15), (12F/9).

The claimant's visual acuity remains correctable to 20/25 in the bilateral eyes, on examinations dated February 5, 2020 (4F/10) and August 7, 2020 (11F/1), after best correction.

Except for his visual field deficit, examinations describe the claimant as neurologically intact, as on October 17, 2021 (14F/3).

[ . . . ]

> In terms of the claimant's alleged psychological disorder, he was diagnosed with major depressive disorder on Jun 8, 2020 (3F/14). [ . . . ]
>
> The claimant does not (14F/3) and discernibly has not (1E/4), (6E/4), followed any regimen of psychotropic medications.
>
> He attended two sessions of counseling in mid-2020, partially meeting two treatment goals, despite the brevity of the program (3F/1, 17).
>
> Notwithstanding this brevity, mental status examinations in the record have consistently, albeit not universally, reported either mildly adverse, or benign findings, including one dated June 8, 2020, which reported that the claimant presented with a depression, angry, anxious mood, but also with an average, open, cooperative demeanor, normal speech, no delusions or hallucinations, a logical thought process, full range of affect, no cognitive impairment, good insight and judgment, no suicidal or homicidal ideation (3F/8), or one dated December 18, 2020, which indicated that the claimant presented as alert and oriented in four spheres, as clean and kempt, with appropriate eye contact, clear speech, as responsive and alert with a somewhat depressed mood and congruent affect (8F/4).

(*Id.,* PageID #: 52-54, Tr. at 23-25).

### IV. The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

> 3. The claimant has the following severe impairments: obesity, cavernous malformation causing epilepsy, the resection of which caused homonymous bilateral visual field defects [hereinafter, collectively, "cavernous malformation"], right knee primary arthritis of the right knee and meniscal tearing, status-post arthroscopy, and major depressive disorder (20 CFR 404.1520(c)).
>
> [. . .]
>
> 5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that the claimant may frequently balance, stoop, occasionally kneel, crouch, crawl, climb ramps and stairs, but may never climb ladders, ropes or scaffolds; the claimant is unable to avoid normal workplace hazards, such as

5

> boxes on the floor, doors ajar, approaching vehicles, and must avoid all exposure to unprotected heights, hazardous machinery and commercial driving; the claimant is limited to the performance of simple, routine tasks and to the making of no more than simple, work-related decisions, conducted in a setting that requires no more than frequent interaction with co-workers, supervisors and the public, which setting is routine, in that it contemplates few changes.
>
> [ . . . ]
>
> 10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).
>
> [ . . . ]
>
> 11. The claimant has not been under a disability, as defined in the Social Security Act, from January 21, 2020, through the date of this decision (20 CFR 404.1520(g)).

(*Id.*, PageID #: 48-49, 51, 57, 58, Tr. at 19-20, 22, 28, 29).

## V. Law & Analysis

### A. Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v.*

*Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

### B. Standard for Disability

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.*

### C. Discussion

#### 1. The ALJ complied with SSR 16-3p.

7

In his first issue, Claimant argues that the ALJ failed to properly apply the criteria of SSR 16-3p. (ECF No. 9 at 9).

The evaluation of a claimant's subjective complaints rests with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs*., 823 F.2d 918, 920 (6th Cir. 1987); *Rogers*, 486 F.3d at 248 (noting that "credibility determinations regarding subjective complaints rest with the ALJ"). In evaluating a claimant's symptoms, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304. Beyond medical evidence, SSR 16-3p sets forth seven factors that the ALJ should consider: claimant's daily activities; the location, duration, frequency, and intensity of symptoms; factors that precipitate and aggravate symptoms; the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; other treatment undertaken to relieve symptoms; other measures taken to relieve symptoms; and any other factors bearing on the limitations of the claimant to perform basic functions. *Id*. The ALJ need not analyze all seven factors but should show that they considered the relevant evidence. *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005). "[I]f an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, we will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities or abilities to function independently, appropriately, and effectively in an age-appropriate manner." SSR 16-3p, 2017 WL 5180304. The ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304; *see*

*also Felisky v. Bowen*, 35 F.2d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so."). While a reviewing court gives deference to an ALJ's credibility determination, "the ALJ's credibility determination will not be upheld if it is unsupported by the record or insufficiently explained." *Carr v. Comm'r of Soc. Sec.*, No. 3:18CV1639, 2019 WL 2465273, at *10 (N.D. Ohio April 24, 2019) (citing *Rogers*, 486 F.3d at 248-49), *report and recommendation adopted by* 2019 WL 3752687 (N.D. Ohio Aug. 8, 2019).

Zeigler appears to make three arguments in this single issue: 1) that the ALJ ignored evidence documenting his disabling impairments; 2) that the ALJ's analysis was insufficient and failed to comply with the requirements of SSR 16-3p; and 3) that the ALJ "cherry picked" the evidence and that based on "the totality of the evidence, the ALJ erroneously concluded that [Claimant's] symptoms were not as severe as alleged." (*Id.* at 13).

First, although Zeigler states that the ALJ ignored evidence, he fails to mention what evidence was allegedly ignored. Although Zeigler's brief contains a lengthy recitation of his testimony and medical history, he fails to explain which evidence the ALJ ignored and how that evidence would have changed the outcome had it been considered. Because Claimant fails to adequately raise this issue on appeal and fails to address it in anything other than a perfunctory manner, the Court considers this argument waived. *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."). Moreover, the only conceivable effort made to explain what the ALJ "ignored" is Claimant's reference to the opinions of the State agency reviewing psychologists who opined that he was

more limited in his ability to interact socially than the ALJ determined in the RFC. (ECF No. 9 at 13 ("The ALJ claimed he considered all the evidence, including the partially persuasive opinions from the State Agency reviewing psychologists, and found that Plaintiff did not have further limitations related to his vision loss and that he was limited to only frequent interaction (not occasional superficial as opined by the State Agency reviewing psychologist) and he could process simple or routine visual materials without making errors as found by Dr. Coleman.")). However, the decision clearly shows that the ALJ considered the State agency reviewing psychologists' opinions. (ECF No. 8, PageID #: 55, Tr. at 26). The ALJ found their opinions partially persuasive and explained:

> Each of these doctors had the opportunity to review the evidence of record, to which each cited liberally in support of their conclusions and each is well versed in the terminology and analytical framework employed in the disposition of these claims. The record shows a clamant treating briefly for depression and testing in the borderline range for intelligence and in the extremely low to borderline range for memory. However, the claimant has an eleventh-grade education, acquired without receipt of special education services (1E/3), and amassed a work history significant for semi-skilled work. Informally, he is assessed with average intellectual function, no impairment of memory, attention, concentration, or the ability to reason in abstract fashion (3F/8). He was able to partially meet his treatment goals after only two sessions of counseling (3F/17). If restricted to the performance of simple, routine tasks, conducted free of the need to mull complex decisions, he appears to have retained sufficient, residual, cognitive function to serve as "backstop" against these cognitive difficulties from becoming fatal to competitive work. The claimant initiated treatment describing anger and temper problems, developing after his visual impairment impeded his ability to return to work. However, he has no forensic history (8F/6), is demonstrably able to function in public settings, such as stores (3E/4), engages in peer group socialization a few times per week (7F/2), and is reliably described in the treatment record in pro-social terms (6F/4), (10F/3), (14F/3). Provided he is not asked to interact continuously with others, he appears to have retained sufficient, residual, social function to engage in competitive work. The claimant has described difficulties reacting to changes and

> stressors appropriately. However, he is said to be possessed of good insight and judgment (3F/8), does not consider himself as impulsive (3F/3), and was able to partially meet his treatment goals after only two sessions of counseling (3F/17). If restricted to the performance of simple, routine tasks to begin with, conducted free of the need to mull complex decisions, or to respond to constant changes, he appears to have retained sufficient, residual, adaptive function to engage in competitive work.

(*Id*., PageID #: 55-56, Tr. at 26-27). Clearly, the ALJ considered the State agency reviewing psychologists' opinions and explained their supportability and consistency with the medical evidence, including the conclusion that the "opinions overstate, to some degree, the claimant's social and adaptive limitations; however, they remain at least partially consistent with, and supported by, the overall evidence of record and are partially persuasive." (*Id*., PageID #: 56, Tr. at 27).

Second, substantial evidence supports the ALJ's analysis of SSR 16-3p. *See Segers v. Comm'r of Soc. Sec.*, No. 5:16-CV-2017, 2017 WL 9478425, at *10 (N.D. Ohio June 19, 2017), *report and recommendation adopted sub nom. Segers v. Berryhill*, No. 5:16-CV-2017, 2017 WL 4129117 (N.D. Ohio Sept. 19, 2017). Here, the ALJ summarized Claimant's subjective symptom testimony as follows:

> The claimant reports workplace limitations, including deficits of his ability to lift, squat, bend, stand, walk, climb, and see (3E/6), which he ascribes to right knee pain (10F/2), seizures, homonymous hemianopia, and a torn meniscus (2A/1), (4A/1). He has also described depression (4A/1), causing deficits of his ability to employ his memory, understand and follow instructions, to concentrate and complete tasks, to get along with others and to react appropriately to stressors and changes (3E/6, 7).

(ECF No. 8, PageID #: 51-52, Tr. at 22-23). The ALJ then found that Claimant's statements regarding the severity of his impairments were not consistent with the evidence:

> In sum, the evidence would indicate that the symptom limitations relevant to these impairments are not as severe as alleged. If

11

> restricted to the performance of work at the light level of exertion, where the claimant would frequently balance, stoop, occasionally kneel, crouch, crawl, climb ramps and stairs, but never climb ladders, ropes or scaffolds; where the claimant would not be expected to avoid normal workplace hazards, such as boxes on the floor, doors ajar, approaching vehicles, and would avoid all exposure to unprotected heights, hazardous machinery and commercial driving, adequate allowance will have been made for these impairments.

(*Id.*, PageID #: 53, Tr. at 24). The ALJ discussed Claimant's reported knee pain and noted that he had not used pain medications following surgery and that Claimant reported feeling better than he had in months. (*Id.*, PageID #: 52, Tr. at 23). The ALJ cited to records showing minimal functional limitation and significant improvement after physical therapy. (*Id.*). Additionally, Claimant had been released from his orthopedist without any restrictions and there was no evidence that he had returned. (*Id.*). The ALJ also discussed Claimant's cavernous malformations[1] and his seizures and sight restrictions caused by the condition and explained how the impairment is not work preclusive. (*Id.*, PageID #: 52-53, Tr. at 23-24). The ALJ cited to records showing "stable findings", Claimant's use of an anti-seizure medication with reports of side effects, no reported seizures, continuing visual field deficits but correctable to 20/25 visual acuity. (*Id.*, PageID #: 53, Tr. at 24).

With respect to Claimant's psychological impairments, the ALJ noted that Claimant was diagnosed with major depressive order and that "this finding would be consistent with the claimant's allegations of depression[.]" (*Id.*). However, "the record, when considered as a whole,

---

[1] "Cerebral cavernous malformations (CCMs) are groups of tightly packed, abnormal small blood vessels with thin walls. They may be present in the brain or spinal cord. The vessels contain slow-moving blood that's usually clotted. CCMs, which look like a small mulberry, can create problems in the brain or spinal cord due to leaking of blood in some people." MAYO CLINIC: CAVERNOUS MALFORMATIONS, https://www.mayoclinic.org/diseases-conditions/cavernous-malformations/symptoms-causes/syc-20360941 (last visited 10/30/2023).

is not supportive of the contention that the existence of this impairment would be preclusive of all types of work." (*Id*.). The ALJ explained:

> In sum, the evidence would indicate that the symptom limitations relevant to these impairments are not as severe as alleged. If restricted to the performance of simple, routine tasks and to the making of no more than simple, work-related decisions, conducted in a setting that requires no more than frequent interaction with co-workers, supervisors and the public, which setting is routine, in that it contemplates few changes, adequate allowance will have been made for these impairments.

(*Id*. PageID #: 54, Tr. at 25). The ALJ also explained how they considered Claimant's account of daily activities:

> the claimant is able to attend to his self-care. He is able to engage in typical household chores, such as cleaning, washing dishes, laundering clothing, preparing simple meals, cutting the grass and making small household repairs. He socializes with his peer group a few times per week, helps his elderly parents, is able to shop in stores, watch television for pleasure. He is able to manage his own medications, appointments, and an e-mail account, and although his wife performs the task, considers himself able to manage his finances (1E/1), (3E), (7F/2). In short, the claimant has described daily activities, which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. While none of these activities, considered in isolation, would warrant or direct a finding of "not disabled"; when considered in combination, they strongly suggest that the claimant would be capable of engaging in the work activity contemplated by the residual functional capacity.

(*Id*.). Additionally, the ALJ considered the expert medical opinions. The ALJ explained that the State agency medical consultants opined that he "would be able to perform light work, could frequently balance, stoop, crouch, crawl, could occasionally kneel, climb ramps and stairs, but could never climb ladders, ropes or scaffolds, that he would have limited left field of vision, should avoid concentrated exposure to humidity, extremes of heat and cold, and should avoid all exposure to unprotected heights and dangerous moving equipment." (*Id*., PageID 54, Tr. at 25).

13

Citing to the medical record, the ALJ explained that the opinions were persuasive in that the "[r]estriction to light work appears appropriate on this evidence, as do the postural limitations as suggested." (*Id.*). However, the ALJ found that the "visual restrictions as indicated are vague, and those suggested by the claimant's ophthalmologist appear to speak more directly to function, both preserved and lost." (*Id.*). With respect to Claimant's environmental limitations, the ALJ stated: "Precautionary against a sudden 'burst' of pain, against visual deficiency, or the need to recover a misstep faster than his body habitus would allow, the claimant should not be asked to work at unprotected height, in the vicinity of inherently dangerous machinery, or to use unguarded climbing apparatuses." (*Id.*). The ALJ found that the opinions slightly overstated Claimant's environmental limitations. (*Id.*). The ALJ found persuasive the opinion of Claimant's ophthalmologist who opined that Claimant cannot drive, engage in tasks requiring a full field of vision, avoid hazards in the workplace [boxes on the floor, doors ajar, approaching people and vehicles], operate heavy machinery, or work at heights.

The ALJ also considered the opinions of the psychological experts. "The state agency psychological consultants [ ] indicated that the claimant would be able to perform simple, repetitive tasks of one-to-three-steps, with no fast pace or high production, involving only occasional and superficial interaction with others, where major changes would be explained in advance and gradually implemented." (ECF No. 8, PageID #: 55, Tr. at 26). The ALJ found that the opinions "overstate, to some degree, the claimant's social and adaptive limitations; however, they remain at least partially consistent with, and supported by, the overall evidence of record and are partially persuasive." (*Id.*, ECF No. 8, PageID #: 56, Tr. at 27). The ALJ also considered the opinion of the consultative psychological examiner who opined that "claimant would not have difficulties interacting with others, but would have some difficulty understanding,

14

remembering or carrying out instruction, concentrating, persisting and maintaining pace and in his ability to adapt to the stressors of day-to-day work." (*Id.*). The ALJ found this opinion not persuasive and explained, "[a]s this opinion indicates limitations in three of the four, psychologically based, work-related areas of function, it is at least marginally consistent with, and supported by, the overall evidence of record, discussed in digest form in the preceding paragraph. However, the opinion overstates the claimant's residual social capacity, and, as to the specific degree of work-related limitation that would appertain, this opinion is vague and therefore less than helpful." (*Id.*).

After detailing their analysis, the ALJ summarized their conclusion: "After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (*Id.*) And the ALJ explicitly noted they had considered SSR 16-3p. (*Id.*, PageID #: 51, Tr. at 22 ("In making this finding, I have considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSR 16-3p.").

As detailed above, the ALJ explained their finding that the severity of Claimant's symptoms is inconsistent with the medical records and considered several of the factors set forth in SSR 16-3p. The ALJ reviewed the relevant objective medical evidence; the location, duration, frequency, and intensity of Claimant's symptoms along with any precipitating and aggravating factors, medications, and other treatments used to relieve symptoms; and Claimant's daily activities. 20 C.F.R. § 404.1529(c)(3)(ii)-(vii). Moreover, Claimant does not explain how the

15

ALJ failed to comply with SSR 16-3p and, instead, he merely makes the general statement that the ALJ somehow failed. Accordingly, the ALJ sufficiently explained their analysis of the SSR 16-3p factors and substantial evidence supports their conclusion.

Finally, to the extent Zeigler seeks to have this Court reweigh the evidence, it will not do so. Zeigler states that "[t]he ALJ's cherry picking of the evidence was in error and resulted in an RFC which was erroneously not supported by substantial evidence and which was contrary to Plaintiff's supported and documented symptoms." (*Id.*). As explained above, Zeigler's brief merely restates his testimony and medical history, but he fails to explain which evidence the ALJ ignored and how that evidence would have changed the outcome had it been considered. Generally, an ALJ has a duty not to cherry-pick facts from the record to support a finding of not disabled where a finding of disabled would otherwise be appropriate. *Smith v. Comm'r of Soc. Sec.*, No. 1:11-cv-2013, 2013 WL 943874, at *6 (N.D. Ohio, March. 11, 2013) (citations omitted). However, an ALJ does not cherry-pick the record simply by resolving discrepancies in the record against the claimant. *Id*. Moreover, courts do not conduct a de novo review of the record, and an ALJ's findings are not subject to reversal for the sole reason that substantial evidence could support the opposite finding. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001). What some describe as "cherry-picking" may more neutrally be termed weighing the evidence. *White v. Comm'r of Soc. Sec.,* 572 F.3d 272, 284 (6th Cir. 2009). It appears that Zeigler wants this Court to reweigh the evidence. However, it is not the role of this Court "to reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995)).

16

Here, the ALJ's decision satisfies the Court that the ALJ considered all of the relevant evidence and that a reasonable mind might accept that evidence as adequate to support the ALJ's credibility finding. There exists, therefore, no compelling reason for the Court to disturb that finding. *Cross,* 373 F. Supp. 2d at 732.

### 2. The ALJ's determination that Claimant could perform work at a light exertion level despite his knee issues is supported by substantial evidence.

In his second issue, Claimant argues that he ALJ erred at Step Five of the sequential analysis when they determined he could perform work at a light exertion level despite his knee problems. (ECF No. 9 at 15).[2] At Step Five the Commissioner has the burden of proof to show "that there is work available in the economy that the claimant can perform." *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). "The step five analysis is meant to determine, given the severity of the impairments already proven, whether there are jobs in the economy which a claimant can perform." *Id*. At Step Five, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (internal quotation marks and citation omitted). "This substantial evidence may be in the form of vocational expert testimony in response to a hypothetical question, but only if the question accurately portrays [the claimant's] individual physical and mental impairments." *Baker v. Barnhart*, 182 F. App'x 497, 500 (6th Cir. 2006) (citations and internal quotation marks

---

[2] Claimant's assignment of error also states that the ALJ erred at Step Four; however, Claimant later states that "the ALJ correctly found that Plaintiff could not perform his past relevant work" and his brief does not include any analysis of any alleged error at Step Four. Accordingly, Claimant has waived any argument regarding an error at Step Four. *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.").

omitted).

The Commissioner met this burden through the testimony of the vocational expert, who testified that work exists in the national economy that accommodates Claimant's RFC and vocational factors. During the hearing, the ALJ posed the following hypothetical:

> For my first hypothetical, I'd like you to consider an individual of the same age, educational background, and work experience as the claimant. I'd like you to presume the individual can perform the full range of light work, subject to the following limitations. Specifically, the individual would be limited to occasional climbing of ramps or stairs, but would never climb ladders, ropes, or scaffolds. The individual would be limited to frequent balancing or stooping, but only occasional kneeling, crouching, or crawling. The individual would need to work in a workplace that is free from hazards such as, boxes on floors, open doors, or approaching vehicles. Individual would never be exposed to unprotected heights, hazardous machinery, or commercial driving. The individual would be limited to the performance of simple, routine tasks, and simple work-related decisions. They would be limited to frequent interactions with supervisors, coworkers, or the general public. The individual would tolerate few changes in a routine work setting.

(ECF No. 8, PageID #: 96-97, Tr. at 67-68). The vocational expert testified that such a person would not be able to perform Claimant's past relevant work but that there are significant jobs in the national economy which such a person could perform. (*Id*., PageID #: 97, Tr. at 68). Relying on the vocational expert's testimony, the ALJ found that Claimant is not disabled.

Here, Claimant challenges that the hypothetical posed to the vocational expert did not accurately portray his physical impairments. Specifically, Claimant argues that the record failed to support that, despite his "knee injury" he could stand and/or walk for the up to six of eight hours required to perform the full range of light work. Here, Claimant cites to the medical evidence pertaining to his knee injury and surgery and then states that "[t]he injury to his knee caused Plaintiff to have difficulty standing and/or walking the six hours a day as required for

18

work at the light level of exertion. [. . .] Plaintiff's knee injury and resulting osteoarthritis clearly established that he was precluded from standing/walking the requisite 6 hours a day for work at the light level of exertion." (ECF No. 9 at 16-17). Claimant does not cite to any medical evidence supporting a greater limitation than determined by the ALJ. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003) ("Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work[.]"). However, as discussed above with regard to the ALJ's consideration of Claimant's subjective complaints, substantial evidence supports the ALJ's determination that Claimant could perform a reduced range of light work, despite his physical limitations. Moreover, the ALJ reasonably adopted the administrative findings of the State agency reviewing physicians, who found that Zeigler could perform a reduced range of work at the light exertional level, which requires standing/walking for up to six hours of an eight-hour workday. (ECF No. 8, PageID #: 54, Tr. at 25). Medical expert opinions are substantial evidence on which the ALJ may rely. *See Hoskins v. Comm'r of Soc. Sec.,* 106 F. App'x 412, 415 (6th Cir. 2004) ("State agency medical consultants are considered experts and their opinions may be entitled to greater weight if their opinions are supported by the evidence."). Zeigler does not challenge the ALJ's decision finding these opinions persuasive. Thus, in making their RFC determination, the ALJ appropriately considered the relevant objective and opinion evidence, and Claimant fails to demonstrate any error. Accordingly, substantial evidence supports the RFC determination.

The Court has concluded that substantial evidence supports the RFC as the ALJ fashioned it. And the ALJ's first hypothetical mirrored the RFC in this case. (*Compare* ECF No. 8, Page ID #: 51, Tr. at 22 *and* PageID #: 96-97, Tr. at 67-68). Thus, the vocational expert's

opinion is itself substantial evidence for the ALJ's Step Five conclusion that there are jobs that exist in significant numbers in the national economy that Zeibler could do despite his limitations. *Smith v. Halter,* 307 F.3d 377, 378 (6th Cir. 2001) (citation omitted); *Baker*, 182 F. App'x at 500.

Accordingly, substantial evidence supports the ALJ's Step Five determination and Claimant's second issue has no merit.

## VI. Recommendation

Based on the foregoing, it is RECOMMENDED that the Court OVERRULE Claimant's Statement of Errors and AFFIRM the Commissioner's decision.

Dated: November 1, 2023

s/ *Carmen E. Henderson*
CARMEN E. HENDERSON
U.S. MAGISTRATE JUDGE

---

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F. 3d 520, 530-31 (6th Cir. 2019).